C. L. WYKOFF, Appellee, v. W. L. STEWART, Appellee, and NATIONAL SURETY COMPANY, Appellant.

**DRAINS:** Construction—Contract, Breach of—Insolvency of Contractor—Withholding Payment of Estimates.  A contractor for a public drainage improvement arms the public authorities with legal right (1) to withhold payment of estimates *as provided in the contract*, (2) to forfeit the contract, and (3) to relet the work, when said contractor (a) becomes insolvent subsequent to entering into the contract, (b) fails to pay just and valid bills for labor and materials, as required by the contract, and permits claims therefor to be filed with the county auditor, and (c) abandons the contract.  (See Sec. 1989-a10, Code Supp., 1913.)

**PRINCIPAL AND SURETY:** Release of Surety—Drainage Bond—Withholding Payment of Estimates—Effect.  Withholding payment of estimates, as provided in a drainage improvement bond, because of the insolvency of the contractor and breach of contract by him, does not release the surety on the bond.

**DRAINS:** Construction—Contract, Forfeiture of—Reletting.  It will, in the absence of evidence to the contrary, be presumed that a contract relet after proper forfeiture was relet at a reasonable price, when such reletting was on proper advertisement, and on notice to the defaulting contractor and surety, and without objection from them.

*Appeal from Humboldt District Court.*—N. J. LEE, Judge.

THURSDAY, SEPTEMBER 20, 1917.

THIS is an appeal from a decree rendered against the defendant surety company and in favor of Drainage District No. 2 of Humboldt County.  A number of cases were consolidated and tried together.  Other claimants inter-

vened. The cases were tried in equity. The surety company appeals.—*Affirmed.*

*McGrath & Archerd,* for appellant.

*John Cunningham* and *W. L. Stewart,* for appellees.

1. DRAINS: construction : contract, breach of : insolvency of contractor : withholding payment of estimates.

PRESTON, J.—The plaintiff, Wykoff, in the case entitled as above, first brought suit against defendant W. L. Stewart, contractor, and the surety company. Two other parties, Lehigh Sewer Pipe & Tile Company, and Lehigh Clay Products Company, brought separate actions. Five or six others filed petitions of intervention. Other defendants are the board of supervisors and its chairman, the county auditor, the drainage district, and other claimants. As said, on the hearing of the main case of the drainage district against the contractor and surety company, the several cases of parties who had filed claims and asked for liens were all consolidated. The court decreed that the claims as filed, which appellants are claiming were not liens, be established, and judgment was rendered. Judgment was rendered against the surety company in favor of the county for the use and benefit of the drainage district and some other 8 or 10 claimants, in the sum of $744.22, and preference was given as against the funds. Appellant concedes that, as to the labor and material bills, no complaint is made, and from the holding of the trial court as to these items, there has been no appeal. Appellant concedes also that the expenses reasonably necessary in completing the job were proper items to pay from the district funds, but says that the district must show that it performed its part of the contract, and that it has not done so because it withheld a part of the estimates, and did not show that it relet the work at a reasonable price. These matters will be referred to later.

The issues presented are those arising in the cross-bill of the surety company and the cross-bill of the drainage district, and the answers of each to the pleadings of the other. The county, the board of supervisors, the auditor and the drainage district are referred to in the argument as "the drainage district." Briefly, the cross-petition of the drainage district alleges the letting of the contract to W. L. Stewart, on February 16, 1912, to construct Drainage Ditch No. 2 for $34,018.10; the execution and delivery of a bond by the contractor, with defendant surety company as security; the failure of the contractor to construct the ditch; the forfeiture of the contract or abandonment of the work; the subsequent reletting of the work, its completion, and the commencement of actions by laborers and materialmen; that all proceedings in reletting the work were in accordance with law. It asked that it be given a preference to the funds remaining against the contractor and the surety company on their bond for the shortage. The surety company alleges that, under the contract, the contractor was entitled to 80 per cent of each estimate as soon as it was filed; that the district refused to pay said 80 per cent, and because of such failure it was impossible for him to complete his contract with the district; that the district had no right to withhold the money; that the district has collected large sums of money on account of the construction of said improvement, and has failed to properly account therefor; that the surety company is entitled to a judgment granting it a preference to the funds in the hands of the drainage district; that, because the drainage district prevented the completion of the contract by the contractor, the surety company is released, and is not liable to the district on its bond because of the wrongful conduct of said district. The drainage district contends that the contractor abandoned the work; that the contract was relet and the work completed; and that it rightfully withheld the 80

per cent under the law and provisions of the contract and bond; and that no part of this money was withheld until after the contractor had abandoned the work, and until after liens or claims were filed. Among other provisions of the contract are the following:

### "Failure to Prosecute Work.

"If the second party shall fail to prosecute the work according to the work specified, or shall fail or refuse to prosecute the work after commencing the same, and damage to the ditch or district results therefrom, the second party shall be liable therefor, and the first party may recover such damage by an action on the bond of the second party; or the said party of the first part may retain from the amount otherwise due the parties of the second part, from time to time, such sum as shall reimburse the parties of the first part for such damage, or enable them to repair the same.

### "Abandoning Work.

"In case the party of the second part shall abandon the work or fail to make satisfactory progress on said work, said first parties may cause said work to be completed, and the parties of the second part, and also the sureties on the bond herein referred to, shall be jointly and severally liable to the parties of the first part for any and all loss and damage resulting from such default, either from the greater expense of so completing said work, or from any other cause.

### "Subletting.

"It is further agreed by the said parties of the second part that it will give its personal attention to the faithful prosecution of said work, and will not assign or sublet the same or any part thereof, without the previous written consent of the parties of the first part, subject to such conditions for its own protection as it may see fit to impose.

"Revoking Contract.

"The parties of the first part may stop the work or revoke this contract, or both, if the party of the second part or its employees shall willfully refuse to comply with any of the terms and requirements hereof, in which event the party of the second part shall forfeit to the parties of the first part all payments due or to become due on said work, as liquidated damages for such breach of contract, and shall be liable for any further damages by reason thereof, and the parties of the first part shall be in no manner liable for stopping the work or revoking the contract.

"Party of the second part will, in a good workmanlike manner, at its own expense, furnish and pay for all labor and material and perform all the work necessary for the excavation and construction of the ditches of the said district."

The bond provides:

"Now, therefore, if the said W. L. Stewart shall well and faithfully perform and carry out all the terms, agreements, conditions and covenants contained in said contract, and shall pay, as they become due, all just claims for work, tools, machinery, skill and material used in the completion of said contract, in accordance with its terms, and if the said W. L. Stewart will save the said county of Humboldt and state of Iowa harmless from all costs and charges that may accrue on account of the doing of the work specified in said contract, then this obligation shall be void; otherwise to remain in full force and effect."

The specifications for the contract provide, among other things:

"All plans, specifications and reports in the possession of the engineer, and all laws enacted by the general assembly of Iowa which may apply to the legal construction of tile drains, shall be considered as part of these general specifications."

Payments were to be made as provided by law.. The contractor began work in September or October, 1912. After he began work, the authorities at first delivered warrants on estimates, but later, materialmen filed liens or statements of their accounts with the county auditor, and thereafter, the drainage district and the auditor refused to deliver any more warrants until the contractor had these bills settled. The drainage district contends that, when the contractor allowed laborers and materialmen to file liens, and when he failed to pay such bills at the time they became due, this worked a violation of the terms of both the contract and the bond, and that the officers having in charge funds which had been collected had no right to pay out such funds after liens were filed, and that it was their duty to withhold payment. This seems to be the point most argued and relied upon.

The points relied upon by the appellant for reversal are that the court erred in holding that withholding payments of 80 per cent of the estimates, which appellant says was unlawful and wrongful, did not release the surety company from liability on the bond, and in holding that the contract with the contractor was legally terminated by the district; in holding that the acts of the district in reletting the work were proper; in holding that the funds of the district had been properly accounted for; and they contend that the evidence fails to show that the work was relet at a reasonable price. The last three propositions are argued together. The further point is made that the court erred in holding that the district was entitled to a preference.

It will be necessary to set out some of the evidence bearing upon these different propositions. The contractor, W. L. Stewart, testifies in part:

"Well, I wanted to go ahead with it and tried to make an arrangement to go ahead with it, but we couldn't get the payments arranged. They would not issue me any more

warrants on what I had estimates on. I gave the county auditor orders to pay each of these liens a certain amount on my estimates, and he refused to do it. I could have, and I said the tile company wanted payment along. He said he would not pay anything until there was enough accumulated to pay all at once, and I said that the tile company wanted payments every month. There were claims filed with the auditor. I don't remember the amount of them. I had estimates. I don't remember the amount now, but I did not have the 80 per cent. There was some $2,000 or $3,000 back, if I remember right, and I wanted the auditor to distribute the amount of those unpaid estimates upon the amount of the liens, as I directed from time to time, and the county auditor insisted on having all of these liens cleared off before he would disburse any of the money. The tile company told me that, if they could get a partial payment every month on the liens, that they would go ahead and fulfill the contract in shipping the tile. When I was doing the work in the fall of 1913, I was in a position to continue the work if they would have issued the estimates to me and the warrants thereon as they were due for this work. I had an arrangement with the tile people by which they could have continued to have shipped me the tile if payments had been made monthly on the estimates I was entitled to."

He claims that the failure to issue warrants on the estimates was the reason he was unable to complete the work, but there is other evidence and there are some other circumstances bearing upon this question which show that the contractor was unable to finish the work, and that he abandoned it and otherwise violated his contract, which justified the district, under the provisions of the contract, to cause the work to be completed in case of abandonment. The contractor also testified:

"I sublet various branches in the latter part of June,

1913. Things was such that I couldn't see my way clear to go ahead with my work. I intended to shut the work down until I could see my way out. * * * Later on, I resumed work after the first action by the board was set aside. I was out from Illinois three times after I shut the work down the last of June. I came out the latter part of August and made arrangements to go ahead with the work along about the first of September, and I made a contract with Mr. Wykoff to go ahead with the main line and two branches. I did not hire a foreman or gang of men at that time. I stayed about 14 days. I next came back to Iowa about October 27 and stayed 7 or 8 days. I came back the third time January 5th, and was here a little better than a week. I sublet the entire work to Mr. Wykoff except those branches that went into the open ditch below where the main line emptied in at the head of the open ditch."

June 29, 1913, Stewart, the contractor, sent word to his foreman from Sadorus, Illinois, as follows: "Stop work; also subcontractors until you see me." June 28, 1913, he wrote the foreman from Urbana, Illinois, as follows:

"I presume you think it strange when you received my message. I have gone to the wall and I am taking the bankrupt law. Do not issue any more checks, return check book, and also the stub which you have of the other book. Figure out the list of checks that you have issued to be paid July 10th. What checks you boys are holding, mail them to the Urbana Banking Company at Urbana, Ill., and they will send you checks for the amount. If you can find out who holds the check that has been sold of the last three weeks' time, let me know. Also send me list. Tell George not to be scared. He will get his money. I am in bad health—a general breakdown. I presume the bond com-

pany will finish the contract.  You probably can sublet it. They will want to sublet it.

"Yours truly,

"W. L. Stewart.

"Keep this noise down as best you can."

Immediately after the receipt of these letters, all parties who had anything coming to them from the contractor filed their claims.  It seems that, after the district had declared the contract forfeited, it was reinstated for a time before the reletting of the work to other parties.  It is contended by appellees that the surety company had knowledge of the proceedings, and were assuming charge and directing the work, at least up to about the time that the contract was finally terminated and relet.  As bearing on this, the traveling adjuster of the surety company testifies that he reported to his superior at Minneapolis his various attempts to adjust the matters growing out of this Stewart bond, and that his superior went into it with him, and thought the adjuster had perhaps made a mistake in joining with the contractor in a request upon the tile company that it continue furnishing the tile; that he had authority to and did sign the company's name; and that he employed attorneys for the surety company.  He refers to notices and letters signed by these attorneys, demanding that the tile company deliver instalments of tile as the surety company should demand from time to time.  These written exhibits are identified by the witness and referred to in the record, but they are not set out in the abstract, and no additional abstract has been filed by appellee.  They are set out in appellee's argument, and appellant makes no objection thereto.  But aside from these documents themselves, we think the testimony of the traveling auditor shows their connection with the contractor in the matter.

Soon after February 13, 1914, the contractor received from defendants the following notice and demand:

"Dakota City, Iowa, February 13, 1914.

"In Re Bond No. 300966, W. L. Stewart, Principal National Surety Company, Surety.

"To W. L. Stewart, Urbana, Illinois, Contractor on Drainage District No. 2, Humboldt County, Iowa, and National Surety Company of New York, Surety on the Bond of said Stewart in said re Drainage District No. 2.

"You and each of you are hereby notified that unless tile are on the ground along the line of the uncompleted ditches and drains in Drainage District No. 2, Humboldt County, Iowa, on or before the 27th day of February, 1914, that being the date of the next meeting of the board of supervisors of said county, the said board of supervisors will declare a forfeiture of said contract in the matter of Drainage District No. 2 and authorize an action sounding in damages to be instituted against the said Stewart and the said National Surety Company. Of the above you and each of you are to take notice and govern yourselves accordingly.

"J. G. Devine, County Auditor."

Prior to this, and on July 22, 1913, the surety company was notified of the default of the contractor and of the filing of liens and of the prior or first termination of the contract. The contractor testifies that, after the receipt of the notice of February 13, 1914, before set out, he did not come to Humboldt; that he did not come to look to see if the branches had an outlet; that he was trying to get the tile company to make shipments of tile; that he then owed the tile companies about $8,000; that he did not think the tile companies would keep on shipping tile unless they got their money; that they did not keep on shipping; that, when he got the notice of the first reletting, he did not come to Humboldt to see about it.

The contract was finally relet July 2, 1914, to Berkland.

Appellant concedes that the usual advertising which precedes the letting was had. The bid of Berkland was in excess of the price at which the work was originally let to Stewart. The county auditor testified:

"The reason that I didn't feel like issuing warrants for this work that was done subsequent to the time of filing of these liens, on estimates that were filed with me subsequent to the reinstatement of the contract, was I felt that I didn't have the right under the statute in view of the liens. That is the only reason I held them up. I acted entirely upon the belief that I couldn't legally pay them out while liens were on file against this drainage fund. When I speak of the liens, I mean the statements that have been filed for the purpose of creating a preference as to the funds in the hands of the drainage district, the statements filed by the materialmen, tile companies and the laborers. These are the claims that have been introduced in the progress of the trial.

"*Redirect Examination.* Mr. Simcock [the adjuster for the surety company] wanted me to issue warrants for all the estimates, and told me that the surety company was behind me, and he couldn't see where I would be taking any chances in issuing the warrants, in view of the fact that the surety company was back of me. I told him that, if the surety company wanted to put that in writing, or satisfied me that they would save me safe from harm because of issuing these warrants, that I would be willing under these conditions to go ahead and issue the warrants; that the only thing I wanted was to escape liability myself. No writing ever came. That was in October, 1913.

"*Recross-examination.* In that same conversation, he said that the surety company's position was that I was not required under the law to hold these up, and that they couldn't file anything to make a valid lien, and that that would be their contention."

The work on said contract was actually stopped in June, 1913, and before any liens were filed or any refusal on the part of the county auditor to pay on estimates. The auditor testifies further:

"If I remember right, he first stopped work about June, 1913. I got my news from the foreman. The forfeiture was made because he abandoned the work. As I remember it, it was forfeited within thirty days after work ceased. I heard nothing from Mr. Stewart up to that time, except what I heard indirectly through the foreman, Mr. Dunn. At the time of the forfeiture, our information was that he was insolvent. * * * No warrants have been issued in payment of any claims that were filed about the time of the first abandonment. Since June, 1913, there has been some tile put in, but no tile furnished that I know of."

1. As to the withholding payments, appellant contends that the contract pro-

2. PRINCIPAL AND SURETY: release of surety: drainage bond: withholding payment of estimates: effect.

vides that the payments were to be made on the contract as by law provided, and that the law required a payment of 80 per cent upon each estimate for labor and material filed by the engineer in charge of the work, and that this means that no time was allowed after the filing with which to make the payment, and that therefore it was the duty of the drainage district and the contractor to issue the warrants for 80 per cent of the amount of the estimates upon their being filed; that it had not reserved the right in its contract with the contractor to withhold the payments which the law required it to make upon the filing of the estimates. Appellant cites mechanics' lien cases, and perhaps some others, to the point that, in such cases, a subcontractor is bound by the terms of the contract between his principal and the owner, and that one has a right to pay in accordance with the terms of his contract (citing *Epeneter v. Montgomery County,* 98 Iowa 159, and cases).

The question therein presented was whether the payments by the owner, made in good faith, without notice, and in strict accordance with the contract, would protect the owner from again paying to the subcontractors the amounts of their respective liens. They also cite *Modern Steel Structural Co. v. Van Buren County,* 126 Iowa 607, where a county paid the contractor for building bridges in accordance with the contract. In those cases, the money was paid by the counties to the contractor. In the instant case, the money was not paid to the contractor, so that we are not called upon to determine whether, had the contractor been paid, the drainage district would have been liable to the subcontractors. In the instant case, though it is not argued, it seems to us that an important matter to be taken into consideration is the fact that the claims of materialmen and laborers were filed; and the refusal of the drainage district to pay the contractor the estimates was based upon the fact that such claims were filed, and the further fact that such claims were, upon the trial of the interventions or otherwise in this case, shown to have been just and their claims allowed, and no complaint is now made thereof, because no appeal has been taken therefrom. The contractor has thus received the benefit. In other words, as we understand it, instead of the drainage district's paying the contractor, and his paying these liens and claims, the liens were established, so that the funds in the hands of the authorities have satisfied or will satisfy such claims. The *Epeneter* case was distinguished in *Simonson Bros. v. Citizens St. Bank,* 105 Iowa 264, 268, where it was said that the payments under the contract in that case were to be made at fixed times, and the holding was that the owner may pay at such times, regardless of his knowledge of subcontractors and their claims, so long as a lien is not filed and he served with notice thereof, and that the rule was based upon the particular wording of the contract and

of the statute under which the case arose. See also *Green Bay Lumber Co. v. Thomas,* 106 Iowa 154, 156; *Iowa Brick Co. v. City of Des Moines,* 111 Iowa 272, 276; *Beach & Weld v. Wakefield,* 107 Iowa 567, 592. We shall not review these cases or go into detail to show why they are not in point in the instant case. Some of the reasons have been already given. Perhaps the strongest reason is that the contractor, Stewart, had violated and abandoned his contract and liens had been filed and the drainage district had declared the contract forfeited before the payment of any of the estimates had been withheld. Under the evidence, the contractor had not performed his part of the contract, while the other parties had done so, and the officers of the drainage district acted within their rights in declaring a forfeiture of the contract and reletting the work. The drainage ditch law, Section 1989-a10, Code Supplement, 1913, provides substantially that, if the contractor fails to perform the work according to the terms specified in his contract, recovery may be had in an action on the bond by the county for the benefit of the district for damages sustained, and the work may be relet; or the board may cause the uncompleted work to be done, paying therefor with the balance of the contract price not theretofore paid over to the contractor, and, if the expenses of so completing the work exceed such balance, action may be brought for the recovery of such excess from the contractor and his bondsmen. It is said by appellant that, if the drainage district had no right to pay to laborers or materialmen the money due the contractor under his estimates, then there was no advantage to be gained or right to be protected by withholding the payments; but it appears that the contractor was insolvent, and, had the drainage district paid the contractor after the laborers and materialmen had filed their liens, there would have been at least the question arising whether the drainage district would be

liable to the laborers and materialmen had the contractor failed to satisfy their claims. Furthermore, as already suggested, such claims were shown on the trial to be just, and the contractor got the benefit of their claims' being established against the fund. This inured to the benefit of the surety company.

2. Appellant contends further that the laborers and materialmen had no liens on the funds due Stewart, the contractor, under Section 3102 of the Code. They rely on the case of *Iowa Pipe & Tile Co. v. Parks & Gerber,* 169 Iowa 438, the syllabus of which they quote as follows:

"A materialman furnishing material to the principal contractor engaged in constructing a drainage improvement under Chapter 2-A, Title X, Supp. Code, 1913, is not entitled to a so-called mechanic's lien under Sec. 3102 of the Code, against the county whose board of supervisors enter into a contract on behalf of the drainage district for the construction of such improvement."

But the facts in that case are very different from the case at bar. That was a case brought against the county to recover for money due laborers and materialmen, and there was no showing that any money was due or owing by the county or by the drainage district, to Parks & Gerber. The plaintiff in that case sought to prove his case within the holding in *Humboldt County v. Ward Bros.,* 163 Iowa 510, where laborers and materialmen whose labor and material had entered into previous estimates upon which the contractor had drawn 80 per cent of the amount of the contract, were asking that they might be adjudged to have a claim against the remaining 20 per cent. It was held that they were equitably entitled to such relief, regardless of such statute, and that the rights of the surety were no greater at this point than those of the contractor, whose performance it insured. But in the *Parks & Gerber* case, it was held that the facts presented did not warrant equit-

able relief independent of the statute. In the instant case, there was money earned, and in the hands of the officers of the drainage district, and appellees contend that the board of supervisors had a right to pay for the completion of the contract of Stewart out of the funds in their hands, which was represented by assessment for that particular work. The authorities did not pay the contractor, but, as said, these claims were established in the trial of this case. In the *Parks & Gerber* case, the claims of laborers and materialmen were filed in 1911, before the new law giving the right to a lien for laborers and materialmen was passed. That law took effect July 4, 1913, and is Chapter 155 of the Acts of the Thirty-fifth General Assembly. This was before the time of filing the claims in the case at bar. Appellees contend that this new statute is a remedial law and refers only to the remedy; and the fact that, in the instant case, the contract between Stewart and the drainage district was entered into before the enactment of this statute would not make any difference in the remedy that might be applied, and that, therefore, the county auditor was justified in withholding payment from the contractor by reason of the fact that said liens were filed, and that, in any event, if this be not true, the acts of the county auditor, if unauthorized, ought not to prejudice the rights of the taxpayers of the drainage district, because the contractor had a remedy against the auditor for refusing to pay the estimates after claims were filed, if he was acting illegally.

On the question as to the statute providing for liens in drainage districts' being remedial, appellees cite *Haskel v. City of Burlington*, 30 Iowa 232. The question there was whether a statute conferred upon the city of Burlington authority to sell lots for taxes delinquent at the time of its passage, and it was held that the statute was remedial in its nature. To the same point, they cite *Cosson v.*

*Bradshaw,* 160 Iowa 296, and other cases.   We are inclined
to appellee's view of this question, but deem it unnecessary
to determine the point.   As already stated, the contractor
had abandoned and in other ways violated his contract, and
it appears that he was insolvent.   There was no premature
payment of labor and material claims, as in some of the
cases cited by appellant.   The claims were not paid at all,
but, as already suggested, the drainage district simply with-
held estimates after the contractor had abandoned his con-
tract, and these claims were established in the trial of this
case, and no complaint is made thereof upon this appeal.
By the decree of the trial court in establishing such claims,
the funds withheld were ordered paid, upon the very claims
which appellant now says were not liens.   The funds will
pay obligations of the contractor which he was required to
pay to the parties having claims and filing statements.   For
these and other reasons before. stated, it seems to us that
the drainage district had a right, under the contract and
under the law, to do just what it did do, and that the dis-
trict has properly accounted for the funds, and that, there-
fore, there was no change in the contract and no prejudice
to the surety company such as would release it.   Having
failed to complete the contract and to perform his part of
the agreement, the contractor could not maintain an action
for the recovery of the retained percentages.

3. As stated, appellant concedes that
the expenses reasonably necessary in com-
pleting the work were proper items to pay
from the district funds, and that this was
a right which it had under the contract and
under the law.   It is objected, however, at this point by
appellants that the drainage district did not show that the
price at which the contract to finish the work that the con-
tractor had agreed to do was relet, was the reasonable
price.   This question seems not to have been raised in the

3. Drains: con-
struction : con-
tract, forfei-
ture of : relet-
ting.

trial court, and we are perhaps not called upon to determine the point. However, it appears that there were readvertisements for the reletting to complete the Stewart contract. The contractor and the surety company were notified of the reletting. The testimony shows that the work described in the contract of reletting is the unfinished portion of the same work that Mr. Stewart had contracted to complete. Neither the contractor nor the surety company made any objection. The contract was relet to Berkland when there were two other bids. There is no evidence in the record that it was not relet at a reasonable price. Appellees contend that it is a proper inference and fair to assume that, when work is advertised at three different times, and is let at a competitive bid, it should be considered let at a fair and reasonable price, unless there is evidence to indicate to the contrary.

4. It is next contended that the drainage district was not entitled to a preference. No authorities are cited, and the appellant's contention is that, as a surety on the bond, it was not liable to the district because of its violation of the contract and terms of the bond. This matter has been considered in discussing the other questions. Some other minor matters are argued, but those we have discussed are the ones most seriously argued and relied upon, and are controlling. It is our conclusion that the decree of the district court was right, and it is, therefore,—
*Affirmed.*

GAYNOR, C. J., WEAVER and STEVENS, JJ., concur.