MARSHALLTOWN STONE CO., Appellee, v. DES MOINES
BRICK MANUFACTURING CO., Appellant.

Corporations: IMPLIED POWER: *Ultra vires* CONTRACT.   A corporation may do those things which are incident and necessary to the carrying out of the purpose of the corporation as expressed in

its charter, which are not expressly prohibited therein. Thus a corporation organized to manufacture commodities usually made of clay has implied power to acquire material from which the same are to be made. But a corporation organized for such a purpose has no implied power to contract with another corporation to pay it for stone used in certain work, on condition that the latter corporation should not furnish the stone, as the same involves the use of material with which it has no concern and the contract is clearly *ultra vires*.

**Same:** ESTOPPEL. The general manager of a corporation may bind it by contracts within the scope of its corporate business; but if made in excess of corporate power the contract may be avoided on that ground, unless there has been such performance and receipt of the benefits thereof as will create an estoppel, in which case the corporation will not be permitted to assert that it was without power to make the contract. In this action no estoppel is shown.

*Appeal from Polk District Court.*—HON. JESSE A. MILLER, Judge.

WEDNESDAY, MAY 11, 1910.

ACTION on an alleged contract resulted in judgment as prayed. The defendant appeals.—*Reversed.*

*Henry & Henry,* for appellant.

*Boardman & Lawrence* and *Bowen, Bremner & Alberson,* for appellee.

LADD, J.—This case has been here twice before. On the first appeal, the contract as alleged in the petition was held not to be vulnerable to the grounds of a demurrer that it was without consideration and against public policy. 114 Iowa, 574. On the second appeal, entering judgment of a dismissal after setting aside the verdict was adjudged error. 101 N. W. 1124. On the last trial, it appeared that plaintiff, a corporation, owned a stone quarry near

Marshalltown in 1898, was selling "rubble" therefrom, and had disposed of two or three carloads of stone, broken by hand. The spur track from the main line of the Chicago Great Western Railway Company ran within four hundred feet of the face of the quarry, but was not extended to it until the latter part of that year. About the 15th or 20th of July, the company entered into a contract for the purchase of a crushing outfit on condition that it might be canceled within thirty days. About the same time Magden & Sheeley applied to the president of the company, F. G. Pierce, for prices on crushed stone for the pavement of Cottage Grove Avenue in Des Moines, and was informed that this would depend on freight rates. The company immediately applied therefor to the freight agent of the railroad company. This agent informed the manager of defendant, Thomas F. Flynn, of this application, and suggested that some arrangement be made to obviate the necessity of the railroad company making very low rates to the stone company which it would be inclined to do, and Flynn promised to see what could be done. Shortly afterwards Pierce was told by someone over the telephone that defendant would like to see him, and he visited its office, where he met Flynn. Pierce testified that after some conversation Flynn mentioned that he had heard that plaintiff was figuring on furnishing Magden & Sheeley stone for the pavement, and would rather plaintiff would not furnish it; that Pierce said he did not feel like withdrawing without getting something out of it; and that it was finally agreed that defendant would pay plaintiff twenty-five cents per cubic yard for all crushed stone used therein, and this was to be computed at one cubic yard to eight yards of pavement, and that, plaintiff undertook not to ship stone to Des Moines during the remainder of the year. Plaintiff immediately notified Magden & Sheeley that it could not quote prices to them, canceled its contract for the stone crusher, and in all respects performed said agreement if

such there was. There were 20,534 cubic yards of pavement, and recovery, if at all, would be for $641.50, with interest. On the other hand, Flynn denied that any arrangement of the kind on the part of defendant was discussed, but testified that he requested J. M. Christy, secretary of the Earlham Land Company, engaged in crushing and selling stone, and W. P. Mumaugh, representing Jack Campbell, who also operated a stone quarry to meet Pierce at defendant's office, and that these men agreed with him that the Earlham Land Company and Campbell should each pay plaintiff twenty-five cents per cubic yard of crushed stone furnished by his principal for said pavement, and that plaintiff should not ship any during the remainder of the year. Both Christy and Mumaugh corroborate Flynn's story. On the other hand, Pierce's testimony is somewhat corroborated by that of Boardman. It is apparent from this recital of the record that the issues of fact were for the jury, and, as we discover no error in the court's rulings during the trial, the case may be disposed of on the theory that there was a contract such as alleged, and that the plaintiff observed its negative requirements. It will be observed that this contract was not for the purchase of stone of plaintiff, nor was it for refraining from shipping stone for any improvement in which defendant was then interested, or in which subsequently it became or expected to become interested. So far as the defendant is concerned, it derived not the slightest advantage from the transaction. The sole consideration was in plaintiff not doing what it otherwise would have done but for defendant's alleged promise. 114 Iowa, 574. According to the jury's finding, the naked agreement was that plaintiff should not ship any broken stone to Des Moines during the remainder of the year, and defendant should pay twenty-five cents per cubic yard for all stone made use of in a certain job, and it may be conceded that unless this agreement was in excess of the corporate powers of defendant, or the latter was

estopped from raising that issue, the judgment must stand. Such powers are defined in one of the articles of incorporation.

The general nature of the business to be transacted by this corporation shall be to manufacture and sell paving brick, pressed brick, fire brick, and sewer or tile pipe in any part of the United States, and also enter into contracts for the performance of any work or construction ·of any structure or improvement, in the doing or construction of which products of the character of those to be manufactured by this company are used, and to do such work and construct such structures and improvements, the intention being that the company shall have the right to enter into contracts for the performance of such work or construction of such structures or improvements and to perform such work, construct such structures or improvements in the city of Des Moines or elsewhere within the state of Iowa and outside the limits of said state, also to purchase or lease real estate for the purpose of said manufacturing, erect buildings and improvements thereon, purchase the necessary material therefor, and to lease or sell any such real estate, buildings, improvements, or material, whether acquired by purchase, lease or contract.

Upon analyzing this, it will be observed that the company was authorized (1) to manufacture certain commodities ordinarily made of clay; (2) to enter into contracts to do work or construct improvements wherein products of the character of such commodities were used; (3) to execute such contracts; (4) to lease or purchase real estate for the purpose of said manufacturing, erect buildings and improvements thereon, and purchase necessary materials for the erection of these; and (5) to lease or sell any of such real estate, buildings, improvements, or materials.

No one could well claim that authority to make the agreement alleged herein might be included within the first or last two subdivisions. The power to contract for

the doing of work or making of improvements and to carry

1. Corporations: implied power: *ultra vires* contract.

the same out necessarily implied the power to acquire materials with which this might be done. To that end there can be no doubt but that defendant was authorized to buy broken stone and other material whenever required for that purpose. This was an implied power. It was nowhere expressly conferred, and the implication is on the ground of necessity, for without it the corporation might be unable to discharge the functions for which it was created. Whatever may fairly be regarded as incidental to and consequential upon those things which are authorized by the charter of a corporation will not be held *ultra vires*, unless expressly prohibited.

As related to the object specified in the article, we may concede that the corporation might exercise such powers as a natural person might properly and lawfully use to accomplish the same results under similar circumstances, and yet these would not include even as incidental thereto that of contracting with another corporation not to ship to a specified locality materials in which it has no interest, in competition with which it deals in no commodity, and in contracts contemplated involving the use of which it had no concern. A clearer case of *ultra vires* can scarcely be imagined. See large number of cases collected in 2 Cook on Corporations, section 681, and notes illustrating what acts of a corporation are to be regarded as *ultra vires*.

Flynn, as general manager, might bind the company within the scope of its corporate business, but not in excess of its powers. Beach on Private Corp. section 209; 10

2. Same: estoppel.

Cyc. 924. And having undertaken to do so, as was found, the corporation may, unless the plea of estoppel be sustained, avoid the contract on this ground. *In re Assignment of Mutual Guaranty Fire Ins. Co.,* 107 Iowa, 143; *Beach v. Wakefield,* 107 Iowa, 567. The principle on which such a plea is sustained was clearly expressed in *Twiss v. Ass'n,* 87 Iowa, 733: "Where an

*ultra vires* contract is made and performed on one side, the other party can not be permitted to enjoy the benefits received, but will be required in a proper action to account; in other words, the doctrine of want of power to contract can not be invoked to aid a party to perpetrate a wrong and injustice." In *Beach v. Wakefield, supra,* the authorities are reviewed at some length, and the conclusion reached that where a private corporation has entered into a contract in excess of its general powers, and has received the fruits or benefits thereof, it is estopped from setting up the defense in an action to enforce performance on its part that it was without power to make such contract.    See, also, *Vermont Furniture Manufacturing Co. v. De Soto Coop. Creamery Co.,* 145 Iowa, 491.    Of course, exceptions obtain where the contract is prohibited by statute or is against public policy. Conceding the agreement in question not to be within exceptions, there is no reason for saying that it is within the rule.    As said, the defendant derived no benefit from this agreement, and there were no fruits for it to enjoy. Nor does it appear to have been entered into for the benefit of another nor even that any other reaped any reward from the plaintiff's naked compliance with its promise of inaction.    Nor can it be said from the record before us that such inaction, aside from not benefiting others, worked any injury to plaintiff save as this may be presumed.    Possibly there may be cases where the circumstances are such that performance by one party to his detriment may estop the other from pleading *ultra vires* even though not benefited, but the detriment must be actual and with the latter's knowledge, not merely presumptive as in the case before us.    We are of the opinion that the contract was in excess of defendant's powers, and that it was not estopped from so pleading.    Our conclusion is that a verdict should have been directed for defendant.—*Reversed.*