HEALY-OWEN-HARTZELL COMPANY v. MONTEVIDEO·
FARMERS & MERCHANTS ELEVATOR COMPANY
AND OTHERS.[1]

December 24, 1925.

Nos. 24,853, 24,859.

**When neither corporation nor its stockholders can question excessive debt as ultra vires.**

1. Where the articles of incorporation of a grain elevator company limit the amount of indebtedness which the company may incur, and its authorized officers incur an indebtedness in excess of such fixed amounts, and the company receives the full benefit thereof, and the company and its stockholders acquiesce in such transactions for a number of years, neither the corporation nor its stockholders can thereafter be heard to say that the transaction was *ultra vires*.

**Valuable consideration for indorsements on notes.**

2. The evidence amply justifies the finding that there was a valuable consideration for the indorsement of the notes in controversy.

**Purpose of the indorsement.**

3. The purpose of the indorsement was to do what the maker undertook to do in case the latter fails.

**Presumption as to erasure of name of one of several indorsers on note.**

4. Where an erasure of the name of one of several indorsers of a promissory note is apparent upon the back of the note, the legal presumption is that the erasure was made prior to the delivery of the note.

**When erasure of name of indorser without knowledge of the others is not an alteration.**

5. Where one of several indorsers of a promissory note, as surety, after indorsing the note, intrusts it to the maker, and the maker, before delivery to the payee, permits such indorser to mark his name off by drawing a pen through it, without the knowledge or consent of the other indorsers, is not such an alteration of the instrument as to discharge the other indorsers where the payee had no notice or

[1]Reported in 206 N. W. 646.

knowledge, when he took the note, of the circumstances under which the name was so marked off.

## Written contract subordinate to chattel mortgage.

6. The evidence supports the finding and conclusion that the plaintiff's lien, under the contract of November 5, 1920, was secondary to the chattel mortgage which the Montevideo bank held upon the elevator buildings.

1. See Corporations, 14a C. J. pp. 326, § 2171; 332, § 2173.
2. See Bills & Notes, 8 C. J. p. 1049, § 1359.
3. See Bills & Notes, 8 C. J. p. 376, § 558.
4. See Alteration of Instruments, 2 C. J. pp. 1275, § 192; 1278, § 194.
5. See Bills & Notes, 8 C. J. p. 374, § 555 (Anno).
6. See Chattel Mortgages, 11 C. J. p. 652, § 395.

4. See note in 39 L. R. A. (N. S.) 100; 1 R. C. L. pp. 1041 et seq.; 1 R. C. L. Supp. pp. 313, 314; 4 R. C. L. Supp. 67.
6. See 5 R. C. L. 447 et seq.; 1 R. C. L. Supp. 1403.

Action in the district court for Chippewa county. The case was tried before Qvale, J., who ordered judgment as stated at length at the beginning of the opinion. Defendants, other than those named on page 333 of the opinion, appealed from order denying their motion for a new trial. Plaintiff appealed from a portion of the judgment as stated on the same page. Affirmed.

*H. V. Mercer & Co.* and *Daly & Barnard*, for plaintiff.

*C. D. Bensel, J. O. Haugland, C. A. Fosnes* and *John C. Haave*, for appealing defendants.

QUINN, J.

This is an action for an accounting and to have the validity of a certain mortgage, upon the elevator property in question, held by the defendant Montevideo Bank determined, and to have a lien, which plaintiff claims to hold upon said elevator property, declared a first lien thereon, and for judgment in form and amount as the equity of the case may demand. The cause was tried upon the

pleadings and proofs, and submitted to the trial court. Very full findings of fact were made and filed, and judgment was ordered, in effect, as follows:

(1) That plaintiff is without recourse against the defendant First National Bank of Montevideo, and is not entitled to any relief; (2) that plaintiff have and recover judgment against the defendants elevator company, A. M. Parks, H. R. Ost, C. B. Borene and O. N. Norman, in the sum of $42,482.40, with interest from December 1, 1921, at the rate of 6 per cent per annum; (3) that, if plaintiff receives any part or portion of the notes held by it as collateral, the same be applied in reduction of such judgment; (4) that plaintiff recover judgment against the defendant elevator company, and each and all of the individual defendants, upon the promissory note for $10,000, mentioned in the pleadings; (5) that the defendant Northwestern National Bank of Minneapolis have and recover judgment against the maker and indorser of the 5 promissory notes for $5,000 each, mentioned in the pleadings, that is to say, against the defendant elevator company and each of the individual defendants; (6) that, upon the payment of the judgment of $42,482.40, in favor of the plaintiff, so much thereof as shall be necessary to satisfy the judgment in favor of the Northwestern National Bank shall be applied in payment thereof, and the balance shall operate to fully satisfy, discharge and extinguish the judgments in favor of the plaintiff; (7) that, upon payment in whole or in part of the judgment in favor of the Northwestern National Bank for $25,000 and interest, such payment shall operate to reduce and satisfy the judgment in favor of the plaintiff for $42,482.40 in a corresponding amount, and that, upon payment in whole or in part of the judgment in favor of plaintiff for $10,000 and interest, such payment shall operate to reduce and satisfy plaintiff's main judgment for $42,482.40, conformable to such payment; (8) that plaintiff recover its costs and disbursements herein.

It was further ordered that judgment be entered forthwith, in accordance with the foregoing, and, if entered before the expiration of 40 days from the date of filing such order, then, in that case,

execution thereon be stayed for a period equaling 60 days from the date of filing such order, during which time any of the parties to the action may make any motion or settle a case or bill of exceptions as he may be advised without prejudice because of the entry of such judgment and with the same force and effect as if no judgment had been entered.

The defendants, other than the defendants elevator company, A. M. Parks, H. R. Ost, C. B. Borene, A. N. Norman, and the Northwestern National Bank, moved for an order striking out certain findings of fact and conclusions of law and, in case that be denied, for a new trial. From an order denying said motions, the individual defendants, designated as appellants in the title of this action, above set forth, appealed. The plaintiff appealed from that portion of the judgment, so entered adjudging that it have no relief as to the defendant First National Bank of Montevideo, and failing and refusing to hold that plaintiff's lien on the elevator is superior to that of said bank, and failing and refusing to hold and adjudge that said elevator be sold and the proceeds applied to satisfy the lien of plaintiff as a first lien thereon.

The plaintiff is a corporation, engaged in the grain and commission business at Minneapolis. The defendant Montevideo Farmers & Merchants Elevator Company is a Minnesota corporation, engaged in operating a grain elevator business at Montevideo. The defendant H. R. Ost was its president, and the defendant C. M. Parks was its secretary and treasurer. He was also cashier of the First National Bank of Montevideo. Each of the individual defendants, except F. M. Ost and he, agreed to take stock, was a stockholder of and interested in the affairs of the elevator company. Between the month of September, 1919, and November 5, 1920, the plaintiff and the elevator company transacted a large amount of business under an oral agreement, whereby the plaintiff advanced, to the elevator company, the requisite amount of money with which to operate its elevator business, including the purchase of grain, and the elevator company agreed to consign and ship to the plaintiff the grain purchased by it, who, in turn, was to sell the same upon the

markets on a commission basis and to render monthly statements therefor to the elevator company. The elevator company was in need of money and credit with which to carry on its grain business. It was indebted to the plaintiff in excess of $42,000.

On the date last above mentioned, the elevator company, H. R. Ost, C. M. Parks, C. B. Borene and O. N. Norman entered into a written agreement with the plaintiff, a copy of which is attached to the complaint, whereby the plaintiff undertook to and did advance, to the elevator company, necessary funds with which to operate its elevator business and with which to purchase grain at its elevator and to consign the same to the plaintiff, for sale on a commission basis, who, in turn, was to sell the same and render a monthly statement therefor to the elevator company.

The business was transacted under the written agreement in the same manner, substantially, as under the oral agreement. The plaintiff advanced and loaned to the elevator company, between the dates above stated, and the elevator company received from it during that time, above all credits, the sum of $25,000 in the aggregate. The elevator company used the money so advanced in the operation of its business, but failed to consign or ship the grain to plaintiff, as agreed upon, for which reason plaintiff demanded of the elevator company that it secure its indebtedness then owing plaintiff, and that, in consequence thereof the parties entered into negotiations which culminated in the execution of the written agreement mentioned. The plaintiff continued to make advancements to the elevator company, but the company failed to ship the grain, so purchased, to plaintiff or to repay the moneys advanced, and the indebtedness increased until it reached a total of something like $35,-000. On December 21, 1920, the plaintiff demanded further security. In compliance therewith, the elevator company delivered to and the plaintiff accepted, as further security, the 6 promissory notes declared upon in the complaint, and plaintiff continued to make advancements.

On the date last mentioned, the elevator company and the four individual defendants who signed the written agreement of Novem-

ber 5, 1920, with a view of furnishing further collateral security to plaintiff, executed the 6 promissory notes mentioned, one being for $10,000 and the other 5 for $5,000 each, payable to the plaintiff or its order. The board of directors of the elevator company then passed a resolution appointing O. N. Norman, a director, and H. E. Swanson, the manager, as a committee to procure the signature of additional members who were interested in the company. The committee took charge of the notes and proceeded to procure such signatures, as indorsers and guarantors on the notes. While this was going on, the notes were kept in the vault at the bank, while not being circulated for signatures. While so in the vault, and after having been signed by all of the individual appellants, Adolph H. Ost, who had indorsed them, went to Swanson and asked to see the notes. They went together to the bank vault, Swanson procured the notes, and Ost told him to scratch his name off, which Swanson did by drawing a pen through the name. Subsequently, the notes were removed to the office of the elevator company, and, while there, another signer, M. J. Dahl, asked Swanson to see the notes. The request being complied with, Dahl took a pen and ran it through his name where he had indorsed the notes. The notes, in that condition, were thereafter delivered to plaintiff, without any knowledge on its part as to the circumstances related, and the plaintiff accepted the notes as collateral to its claim against the elevator company and extended the time of payment of its account, and, in reliance upon such notes, continued further advancements to the elevator company. Plaintiff then took the notes, with others, to the defendant Northwestern National Bank, and put them up as collateral to a loan, a part of which was used to finance the elevator company. Up to that time, no question was made, either to the plaintiff or to the bank, nor did either of them have any notice or knowledge that the notes were claimed to be invalid, for any reason, either as to the makers or indorsers.

It is now claimed, and the contention of the individual appellants is, that the scratching of the names of the two indorsers and guarantors released the other indorsers and guarantors of all liability on the notes; that it amounted, in law, to such an alteration of the

contract as to relieve them from liability thereon. We are unable to concur in this contention. There was a valuable consideration to appellants. Midland Nat. Bank v. Security Elev. Co. 161 Minn. 30, 200 N. W. 851. The evidence justified a finding that there was a sufficient consideration for the indorsement of the notes and the trial court so found. Galbraith v. Clark, 138 Minn. 255, 164 N. W. 902; Merchants State Bank v. Sunset O. L. Co. 158 Minn. 108, 196 N. W. 963; McDonald Bros. Co. v. Koltes, 155 Minn. 24, 192 N. W. 109.

Appellants further contend that the articles of incorporation of the elevator company limited the amount of indebtedness or liability to which the company should be subject, at any one time, to $15,000. While this is true, yet appellants' liability is based squarely on their express contract guaranteeing payment of the specific notes of the company. They clearly acquiesced in the contracts and cannot now be heard to complain that they were *ultra vires*. Olson v. Warroad Merc. Co. 136 Minn. 310, 161 N. W. 713. Appellants were guarantors as well as indorsers of the notes in question. The notes provide that, "We * * * guarantee its payment any time after maturity." Their contract is a separate agreement to guarantee the payment of the debt, evidenced by the notes. 8 C. J. 375; G. S. 1923, § 7108-9; Farmers & M. Sav. Bank v. Hudson, 62 Utah 131, 218 Pac. 93. The elevator company received the money upon the notes. As stated in Guernsey v. Imperial Bank, 188 F. 300, 110 C. C. A. 278, 40 L. R. A. (N. S.) 377, 8 C. C. A.: "The purpose of an endorsement is the promise to do what the maker undertakes to do if the latter fails, and that is to pay the note where it is payable."

The scratching of the two names was done before the notes were delivered to the payee. Under such conditions, the act could not amount to an alteration as to the payee or the bank. The notes were of their present tenor when they were delivered to and accepted by the plaintiff for value and in good faith. The presumption was that scratching was made before delivery. Wilson v. Hayes, 40 Minn. 531, 42 N. W. 467, 4 L. R. A. 196, 12 Am. St. 754, and cases therein cited. The trial court found, in effect, that, at the time of

delivery of the notes, they were exactly in their present condition and of the same tenor; that Ost and Dahl each signed his name on the back of the notes as indorsers thereof, and thereafter each crossed out his name by drawing a line through his signature, but that such acts were unknown to plaintiff, who received no notice thereof until after the commencement of an action on such notes. The findings are well supported by evidence in the record.

It is urged, on behalf of appellants, that delivery, within the meaning of the law, is not a delivery to the payee, but the passing of the instrument between the signers from one to another for the purpose of indorsements with the contemplated delivery by the principal to the payee. Such is not the rule in this state, as shown by the opinion in Wilson v. Hayes, supra. If this was the rule, an understanding might be easily arranged by the indorsers that a certain number should sign and thereafter one should secretly strike off his name and thereby destroy the security otherwise obtained by such indorsement. Even if the striking out of the names of the two indorsers amounted to an alteration, yet the fact would have little or no effect upon the situation. As a general rule, a change, made with the consent of the parties to the instrument, does not avoid it, but it will be binding on the consenting parties in its altered form. 2 C. J. pp. 1236-1237. In the instant case, it appears conclusively that Swanson had charge of the notes for all of the parties signing the same, either as principals or as indorsers and guarantors. He did the actual physical work of running a pen through the name of Ost, at the latter's request, and he procured the notes and allowed Dahl to run a pen through his name. No question is or could be made but what the appellants all allowed the notes to go into the hands of the committee, and then allowed them to go into the hands of Swanson as the manager of the Elevator Company for the purpose of raising money on them, and consequently they must bear any consequence of a violation on his part, if any there was. Hess v. Schaffner (Tex. Civ. App.) 139 S. W. 1024, 1027, and cases cited in 32 Cyc. 46; Ward v. Hackett, 30 Minn. 150, 14 N. W. 578, 44 Am. Rep. 187; Sinclair v. Investors Synd.

125 Minn. 311, 146 N. W. 1109; American S. M. Co. v. Holzbauer, 117 Minn. 278, 135 N. W. 807; Pittsburg R. Co. v. Keokuk & H. Bridge Co. 131 U. S. 371, 9 Sup. Ct. 770, 33 L. ed. 157; Public Bank v. Burchard, 135 Minn. 171, 160 N. W. 667. We are of the opinion and hold that the appellants were each liable upon the notes in question.

In the order for judgment herein, it was adjudged and decreed that plaintiff was without recourse against the defendant First National Bank of Montevideo and is entitled to no relief as against it. Judgment was entered in accordance with such finding and the plaintiff appealed from that part thereof adjudging and decreeing that plaintiff have no relief against the defendant First National Bank of Montevideo and failing and refusing to hold that plaintiff's lien, which it claimed to have under the contract of November 5, 1920, on the elevator in issue, was not superior to that of the bank, and failing and refusing to hold and adjudge that such elevator be sold and the proceeds go to satisfy the lien of plaintiff.

On October 14, 1920, the elevator company executed a chattel mortgage upon such elevator to the First National Bank of Montevideo to secure the payment of $18,000, maturing October 14, 1921, and drawing interest at 8 per cent per annum. This mortgage was duly recorded on October 22, 1920. The contract of November 5, 1920, under which plaintiff claims a lien upon such elevator provides, among other things, as follows:

"That the Elevator Company will ship out all grain as fast as convenient, to reduce its indebtedness to the commission merchant, and the commission merchant is hereby given a lien on said elevator and all grain purchased by the Elevator Company as security for all indebtedness to the commission merchant; and the Elevator Company shall keep the elevator and all grain therein fully insured, with a clause attached to the policies providing that the loss, if any, be payable to the commission merchant as its interest may appear."

The contract was not acknowledged nor recorded.

The evidence supports the finding and conclusion of the trial court

that the Montevideo bank had a first lien upon the elevator build-ing, under its chattel mortgage, to the amount of the full value there-of, and that plaintiff's lien contract of November 5, 1920, was second-ary thereto. It therefore follows that the order of the trial court, upon each of the appeals, should be sustained.

Affirmed.