### WATERS et al. v. DISBROW & CO. et al.
### No. 9773.

Circuit Court of Appeals, Eighth Circuit.
April 2, 1934.

William J. Hotz, of Omaha, Neb. (Reed A. Flickinger, of Council Bluffs, Iowa, and Ernest H. Struve, of Clinton, Iowa, on the brief), for appellants.

Winthrop B. Lane, of Omaha, Neb. (Arthur R. Wells, Paul L. Martin, Casper Y. Offutt, and Harry C. De Lamatre, all of Omaha, Neb., on the brief), for appellees Disbrow & Co., Maynard C. Cole, Oscar F. Ellison, Maynard B. Copeland, and Ernest L. Glover.

Kenneth S. Finlayson, of Omaha, Neb. (Finlayson, Burke & McKie, of Omaha, Neb., on the brief), for appellee First Nat. Bank of Omaha.

Before GARDNER, VAN VALKEN-BURGH, and BOOTH, Circuit Judges.

BOOTH, Circuit Judge.

This is an appeal by plaintiffs from a decree in a stockholders' suit, brought on account of certain alleged ultra vires transactions on the part of the corporation, M. A. Disbrow & Company.

█ At the outset we are met with the question of jurisdiction. It is conceded that there is diversity of citizenship between the plaintiffs and the defendants as named in the bill, the former being citizens of Iowa and the latter citizens of Nebraska; but it is contended that the allegations in the bill show that a corporation, M. A. Disbrow & Company, a citizen of Iowa, is a necessary party defendant, and if named as such would defeat the jurisdiction, inasmuch as then there would not be diversity of citizenship between it and plaintiffs.

We have examined the record and agree with the trial court in holding that M. A. Disbrow & Company is not a necessary party defendant, and that the trial court had jurisdiction.

█ The question is also raised whether the bill meets the requirements of Federal Equity Rule 27 (28 USCA § 723), in that the defendant Disbrow & Company, a Nebraska corporation, was not in existence at the time the acts complained of were committed, but that those acts were committed by M. A. Disbrow & Company, an Iowa corporation, in con-

nection with defendant bank and the individual defendants.

Federal Equity Rule 27 reads as follows: "Every bill brought by one or more stockholders in a corporation against the corporation and other parties, founded on rights which may properly be asserted by the corporation, must be verified by oath, and must contain an allegation that the plaintiff was a shareholder at the time of the transaction of which he complains, or that his share had devolved on him since by operation of law, and that the suit is not a collusive one to confer on a court of the United States jurisdiction of a case of which it would not otherwise have cognizance. It must also set forth with particularity the efforts of the plaintiff to secure such action as he desires on the part of the managing directors or trustees, and, if necessary, of the shareholders, and the causes of his failure to obtain such action, or the reasons for not making such effort."

It appears, however, from the bill that plaintiffs were stockholders in M. A. Disbrow & Company, the Iowa corporation, at the time the acts complained of were committed by it, and that that corporation has disposed of its assets to Disbrow & Company, the Nebraska corporation, and though still in existence, the Iowa corporation has ceased to do business; that the Nebraska corporation has assumed all the liabilities of the Iowa corporation and that plaintiffs have been stockholders in the Nebraska corporation since its organization.

We think the bill meets the requirements of the Federal Equity Rule mentioned.

The main facts are substantially as follows: About 1884, M. A. Disbrow organized under the laws of Iowa a corporation to carry on the business of a sash and door company. The company had a mill located at Clinton, Iowa. Mr. Disbrow was the largest stockholder. About 1886, defendant Copeland, one of the stockholders in the Iowa corporation, went to Omaha and opened a branch office of the Iowa Company. The business at Omaha grew and became the major portion of the business done. In 1906, M. A. Disbrow died. His interest passed to his widow and the management of the corporation was placed largely in the hands of defendant Copeland. Mrs. Disbrow died in 1913 and her stock passed to her three children, Flora Disbrow, an incompetent; Mrs. Leon L. Du Bois; and W. B. Disbrow. Defendant Copeland was elected president and has held that office ever since. The other individual de-

fendants were directors and stockholders in M. A. Disbrow & Company during the times covered by the transactions herein complained about.

Plaintiff J. M. Waters was appointed legal guardian of Flora Disbrow, incompetent, in 1914 by the district court of Clinton county, Iowa. Later, and in 1932, W. B. Disbrow was appointed joint guardian.

Waters was an employee of the Disbrow Company. He attended the stockholders' meetings from time to time after his appointment until 1931 and voted the stock standing in the name of Flora Disbrow.

About 1919, W. B. Disbrow sold his stock to his sister, Mrs. Du Bois, and her husband. In 1922 Mrs. Du Bois and her husband sold all of the stock owned by them, consisting of 429 shares, to defendant Copeland for the sum of $224,950, payable $20,950 in cash, and the balance in ten annual installments of $20,400 each. Copeland sold some of his stock to defendants Glover, Cole, and Ellison individually. At the time of these transactions, the Company was making large profits and paying large dividends.

On February 14, 1930, defendant Cole owed defendant Bank $5,150, evidenced by promissory notes secured by 16 shares of the stock of M. A. Disbrow & Company as collateral. On the same date, defendant Ellison owed the Bank $4,700, evidenced by promissory notes secured by 25 shares of M. A. Disbrow & Company.

On the same date defendant Copeland owed the Bank $10,000, evidenced by a promissory note secured by stock in M. A. Disbrow & Company.

In addition, defendant Ellison owed M. A. Disbrow & Company $600, evidenced by a promissory note.

These notes had their origin in the purchase of stock in M. A. Disbrow & Company by the respective parties.

On February 14, 1930, the indebtedness of Copeland, Cole, and Ellison to the Bank was satisfied by the necessary entries of credits, and a new loan of $19,500 was set up as owing by M. A. Disbrow & Company; the difference in totals being made up of refunds of interest by the Bank and by a small payment by M. A. Disbrow & Company to the Bank.

On the books of M. A. Disbrow & Company, the transactions were entered showing notes receivable: Copeland $10,000, Cole $5,296.72, Ellison $5,000; adjustments of small amounts being made through the personal accounts of the parties, and the $600 note of Ellison being included in the $5,000 note receivable.

Copeland thereupon gave his note to M. A. Disbrow & Company for $10,000; Cole gave his note for $5,500; and Ellison his note for $5,000.

While the origin of the several notes held by the Bank on February 14, 1930, was the purchase of stock, yet the facts as to the Cole and Ellison notes differ from the facts as to the note of $10,000 of Copeland in important particulars. The Cole and Ellison notes represented moneys borrowed by Cole and Ellison from the bank in the usual course of business, and so far as the record shows, they were valid negotiable paper without infirmity. Such being the facts, the taking over from the Bank of these notes by M. A. Disbrow & Company in February, 1930, and the increasing of its own indebtedness at the Bank therefor were of no benefit direct or indirect to the corporation, but were ultra vires acts on the part of the corporation. They were participated in by the Bank with full knowledge of all of the facts.

In May, 1931, the defendant Nebraska corporation was formed. Shares of its stock were issued to the holders of stock of the Iowa corporation in equal proportions, and most of the property of the Iowa corporation, including the notes of Copeland, Glover, Cole, and Ellison, was conveyed to the Nebraska corporation, in consideration of which the Nebraska corporation assumed the obligations of the Iowa corporation, including its indebtedness to the First National Bank of Omaha. Each of the stockholders of the Iowa corporation accepted the stock of the Nebraska corporation in lieu of the stock of the Iowa corporation.

The Iowa corporation up to the time of the formation of its successor, the Nebraska corporation, and thereafter the latter corporation during all the times it was involved in the transactions complained of, was a borrower at the Bank, and the evidence shows that at certain times, while the corporation was carrying the amounts of the notes of these stockholders in its own bank borrowings, the Bank was insisting that the corporation loans from the Bank be reduced. It may be added that the advancements by the corporation to its stockholders did not always carry interest.

It is the contention of the plaintiffs, and it would seem that under the circumstances no citation of authorities is necessary to sustain a holding, that the loans by the corporation of its assets or its credit to its stockholders were, under the facts disclosed by the

record, ultra vires acts. Abundant authorities are, however, not wanting.

In Thomas v. West Jersey Railroad Co., 101 U. S. 71, page 82, 25 L. Ed. 950, the court said: "We take the general doctrine to be in this country, though there may be exceptional cases and some authorities to the contrary, that the powers of corporations organized under legislative statutes are such and such only as those statutes confer. Conceding the rule applicable to all statutes, that what is fairly implied is as much granted as what is expressed, it remains that the charter of a corporation is the measure of its powers, and that the enumeration of these powers implies the exclusion of all others."

In Green Bay, etc., R. Co. v. Union, etc., Co., 107 U. S. 98, page 100, 2 S. Ct. 221, 223, 27 L. Ed. 413, the court said: "The general doctrine upon this subject is now well settled. The charter of a corporation, read in connection with the general laws applicable to it, is the measure of its powers, and a contract manifestly beyond those powers will not sustain an action against the corporation. But whatever, under the charter and other general laws, reasonably construed, may fairly be regarded as incidental to the objects for which the corporation is created, is not to be taken as prohibited."

In Central Trans. Co. v. Pullman's Palace Car Co., 139 U. S. 24, page 48, 11 S. Ct. 478, 484, 35 L. Ed. 55, the court said: "The charter of a corporation, read in the light of any general laws which are applicable, is the measure of its powers, and the enumeration of those powers implies the exclusion of all others not fairly incidental."

See, also, Pennsylvania R. Co. v. St. Louis, Alton, etc., Railroad Co., 118 U. S. 290, 6 S. Ct. 1094, 30 L. Ed. 83; Oregon Railway & Nav. Co. v. Oregonian R. Co., 130 U. S. 1, 9 S. Ct. 409, 32 L. Ed. 837; California Bank v. Kennedy, 167 U. S. 362, 367, 17 S. Ct. 831, 42 L. Ed. 198.

The same rule is recognized in this circuit. In Union Pac. R. Co. v. Chicago, R. I. & P. Ry. Co. (C. C. A.) 51 F. 309, page 316, the court said: "Corporations created under statutory authority are the creatures of the statute. By it their powers are measured. Beyond the limits of the powers there granted, and those fairly incidental thereto, they may not act; they may not agree to act. Their contracts for the just exercise of these powers are binding and enforceable; but their contracts beyond the scope of these granted powers are null—are as though they had not been."

In Anglo-American Land M. & A. Co. v. Lombard (C. C. A.) 132 F. 721, page 736, the court said: "The settled rule is that a corporation possesses only such powers as are expressed or fairly implied in the statute by or under which it is created; that the enumeration of these powers implies the exclusion of all others; and that any ambiguity or doubt respecting the possession of any particular power arising out of the terms used in the statute, is to be resolved against its possession."

See, also, Park Hotel Co. v. Fourth National Bank (C. C. A.) 86 F. 742; Lyon, Potter & Co. v. First Nat. Bank (C. C. A.) 85 F. 120.

The foregoing rule is recognized in the state of Iowa. In Lucas v. White Line Transfer Co., 70 Iowa, 541, 30 N. W. 771, page 775, 59 Am. Rep. 449, the court said:

"The simple act of going security for another is out of the line of the prosecution of any business. It is a mere accommodation, and it cannot be assumed that the articles gave the officers of defendant any power to jeopardize its capital in any such venture.

" 'It is no part of the ordinary business of commercial corporations, and, a fortiori, still less so of non-commercial corporations, to become surety for others. Under ordinary circumstances, without positive authority in this behalf in the grant of corporate power, all engagements of this description are ultra vires, whether in the indirect form of going on accommodation bills, or otherwise becoming liable for the debts of others.' Green's Brice, Ultra Vires, 252."

See, also, Banker's Mut. Casualty Co. v. First. Nat. Bank, 131 Iowa, 456, 108 N. W. 1046, 1048; Marshalltown Stone Co. v. Des Moines Brick Mfg. Co., 149 Iowa, 141, 126 N. W. 190; Pomeroy v. Farmers' Sav. Bank, 203 Iowa, 524, 211 N. W. 219.

The same rule is recognized in Nebraska.

In Durland v. Elkhorn Life & Acc. Ins. Co., 112 Neb. 105, 198 N. W. 564, page 566, the court said: "The principle is well established that the powers of a corporation are defined by and limited to those provided for and granted by its charter and the statute under which it is organized, and it possesses no powers other than those expressly stated and such [as] are necessarily implied therefrom."

In Schofield v. Goodrich Bros. Banking Co., 98 F. 271, 272 (C. C. A. 8), the court said: "The supreme court of Nebraska, in construing these laws, has held, in accord with the general current of authority, that

the enumeration of its powers by a corporation in its articles of incorporation, under these statutes, is the exclusion of all other powers."

See, also, Smith v. Steele, 8 Neb. 115; State v. Atchison & N. R. Co., 24 Neb. 143, 38 N. W. 43, 8 Am. St. Rep. 164; State v. Nebraska Distilling Co., 29 Neb. 700, 46 N. W. 155; Sturdevant Bros. & Co. v. Farmers' & Merchants' Bank, 69 Neb. 220, 95 N. W. 819; Horst v. Lewis, 71 Neb. 365, 98 N. W. 1046, 103 N. W. 460; Allison v. Fidelity Mut. Fire Ins. Co., 81 Neb. 494, 116 N. W. 274, 129 Am. St. Rep. 694; Mapes v. German Bank of Tilden, 176 F. 89 (C. C. A. 8).

The cases of Garrison Canning Co. v. Stanley, 133 Iowa, 57, 110 N. W. 171, and Sweet v. Lang (D. C.) 14 F.(2d) 758, affirmed in 14 F.(2d) 762 (C. C. A. 8), relied upon by the appellee Bank, are not, when the facts involved are fully considered, in conflict with the foregoing authorities.

We find nothing in the statutes of Iowa or of Nebraska, or in the decisions of the courts of those states, which empowers a corporation organized for manufacturing purposes to loan its assets or its credit to directors and stockholders of the corporation at the expense of its working capital or credit, to enable them to pay their own private debts; and we find nothing in the articles of incorporation of the M. A. Disbrow & Company, or those of the Disbrow & Company, which directly or indirectly authorizes either of those corporations respectively to loan the money or credit of the corporation to the directors or stockholders of the corporation; and especially when the corporation itself is a borrower in carrying on its business.

■ It is sought to legitimize the transaction as to the Cole and Ellison notes by asserting that the corporation had been accustomed to make advances in the way of loans to its stockholders, and that the corporation, both of Iowa and of Nebraska, was a "family corporation." While that term is sometimes used to excuse loose methods of corporate management, we do not think that the rights and duties of a so-called "family corporation" or of its stockholders are, in legal effect, any different from those of a nonfamily corporation. Nor do we think that plaintiffs are estopped to question the validity of the taking over from the Bank by the corporation of the indebtedness of Cole and Ellison to the Bank, and the increasing of the corporation's indebtedness to the Bank by the amount so taken over; it does not clearly appear from the record that these transactions were ever brought specifically to the attention of plaintiffs; and there is not even a suggestion that the transactions were ever brought to the attention of the court in charge of the guardianship of the incompetent, Flora Disbrow.

■ It does not clearly appear whether Waters was present at a stockholders' or directors' meeting when the taking over from the Bank of the notes of Cole and Ellison was purportedly authorized or ratified. But whether Waters was present at such meeting or not would make no difference. He could not by his wrongful act as a director authorize or ratify a transaction which was ultra vires the corporation, and thus bind his incompetent ward. Approval by the court appointing him guardian was necessary. Code Iowa 1931, §§ 12581, 12613; 28 C. J., § 210, p. 1125; In re Guardianship of Pharmer, 211 Iowa, 1285, 235 N. W. 478; Robinson v. Irwin, 204 Iowa, 98, 214 N. W. 696.

Other contentions urged in favor of a justification of the corporation's taking over the Cole and Ellison notes are not persuasive.

The facts as to the Copeland note of $10,000 which the Bank held on February 14, 1930, are somewhat different. As to the origin of this note, the testimony of Copeland himself is as follows:

"Q. On December 30, 1927, you did not owe the First National Bank any money, did you? A. No. sir. (And the witness indicated that he was talking about himself.)

"Q. And you owed the corporation on open account on that day $15,834.25, according to the records? A. Yes.

"Q. On that date you borrowed from the bank $16,000.00 less discount? A. Yes.

"Q. And paid off the obligations of [to] the company? A. Yes, I borrowed $16,000.00 from the bank and got credit less the discount.

"Q. That was the beginning of the $10,000.00 note that you owed the bank in February, 1930? A. Yes sir.

"Q. And that was reduced, by subsequent payments, to $10,000.00? A. Yes, sir, it was.

"Q. And that was switched back and forth between the company and the bank once or twice in the interim? A. Yes sir."

On December 26, 1928, Copeland again owed the Bank nothing. He had borrowed from the company during that year, however, about $27,000 and was still indebted to it in December in an amount of upwards of $11,000.

On December 26, 1928, Copeland borrow-

ed $11,500 from the Bank, giving his note therefor secured by stock in the corporation, and applied $11,185 of it upon the debt which he owed to the corporation.

It appears from the evidence that Copeland's debt, originally to the corporation on account of his purchase of stock of the company from Mrs. Du Bois, was switched from the corporation to the Bank and back again several times prior to February 14, 1930, on which date the debt stood owing to the Bank in the sum of $10,000.

We think it is clear from the record that this whole series of transactions was known to the Bank in all details. And we think it is also clear as a matter of law that the original advancements by the corporation to Copeland to aid him in paying for the stock purchased by him from Mrs. Du Bois were ultra vires and void; that the agreement by the corporation with the Bank, at the times the Copeland debt was switched to the Bank, that the corporation would see that the notes were paid when due was ultra vires and void; and that the taking over by the corporation of the Copeland note for $10,000 from the Bank on February 14, 1930, was also ultra vires and void.

What we have said relative to the Copeland transactions and the resulting $10,000 Copeland note applies equally, with minor changes, to the Glover transactions and the resulting Glover note of $20,500 held by the corporation at the commencement of the present suit.

The Cole and Ellison notes represent debts that were originally alike; debts which were originally owing to the Bank. Wiping out the ultra vires acts of the corporation which we have pointed out relative to these notes, leaves the debts owing to the Bank as they originally were.

The Copeland and Glover notes represent debts that were originally alike; debts which were originally owing to the corporation. Wiping out the ultra vires acts of the corporation which we have pointed out relative to these notes leaves the debts owing to the corporation as they originally were.

The increase in the obligations of the corporation to the Bank, resulting from the switching of the Copeland and Glover debts from the corporation to the Bank and back again, remains as an obligation of the corporation to the Bank. It rests not upon the basis of acts of the corporation which were ultra vires, but upon the basis of money had and received by the corporation, for which it remains liable. Smith v. Robins, 236 F. 114

(C. C. A. 8); Leonard v. State Exchange Bank, 236 F. 316 (C. C. A. 8); Flower v. Commercial Trust Co., 223 F. 318 (C. C. A. 8); Cherry v. City Nat. Bank, 144 F. 587 (C. C. A. 8).

We do not, however, wish to be understood as agreeing with counsel for appellees that the notes given to the Bank by Glover and by Copeland for the loans obtained by them were accommodation paper on which the corporation was the real party liable. It is true that the moneys borrowed by Copeland and Glover from the Bank were used by them to pay their personal debts to the corporation, and that the corporation was benefited thereby; but this was far from making the notes accommodation paper. If the transactions had been legal, very substantial benefits would have accrued to Copeland and Glover in having their debts to the corporation paid.

Smith v. Robins, supra, lends no support to such a theory of accommodation paper. That case was, as we think, decided rather on the theory of money had and received. Blodgett had borrowed the money from Robins for a specific purpose, and then converted it and turned it over to the Cox-Blodgett Company, and that Company used it and later repaid it to Robins. It was rightly held that Smith, the trustee in bankruptcy of the Company, could not recover it back from Robins. There was no question of ultra vires transactions in the case.

Assuming that the foregoing views are correct, the relations of the various parties should be adjusted along the following lines: The dismissal of the bill as to the First National Bank of Omaha should be set aside and the Bank reinstated as a party defendant. The plaintiffs should have judgment on behalf of the corporation against Copeland for the full amount owing by him to the corporation for advancements, with interest, made during the statutory period of limitations, found upon an accounting based, not upon the note of Copeland held by the corporation nor upon open account, but as for money had and received. Execution should issue in the usual way. Similar judgment should be entered after an accounting against Glover; and execution issued. The notes held by the corporation against Copeland and Glover, with collateral, if any, should be returned to them. Notes should be executed by Cole and by Ellison to the Bank covering the amounts owing from them to the Bank on February 14, 1930. Collateral should be restored to the Bank by the corporation. The notes executed by Cole and Ellison to the corporation should be returned to them. The

Bank should cancel so much of the indebtedness of the corporation as equals the amounts of the Cole and Ellison notes held by the Bank on February 14, 1930. The increase of indebtedness of the corporation to the Bank caused by the switching of the Copeland and Glover notes should stand, inasmuch as the money obtained from the Bank was actually used by the corporation and the corporation still has its cause of action against Copeland and Glover for the amounts advanced to them.

The foregoing views find support in the decisions of the federal courts; also in the decisions of the state of Iowa, the home of the Iowa corporation; and in the decisions of the state of Nebraska, the home of the Nebraska corporation.

In Central Trans. Co. v. Pullman's Palace Car Co., supra, the court said (page 60 of 139 U. S., 11 S. Ct. 478, 488):

"A contract ultra vires being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it.

"In such case, however, the action is not maintained upon the unlawful contract, nor according to its terms; but on an implied contract of the defendant to return, or, failing to do that, to make compensation for, property or money which it has no right to retain. To maintain such an action is not to affirm, but to disaffirm, the unlawful contract."

In De La Vergne Refrigerating Mach. Co. v. German Savings Inst., 175 U. S. 40, page 58, 20 S. Ct. 20, 25, 44 L. Ed. 65, the court said: "Whatever doubts might have been once entertained as to the power of corporations to set up the defense of ultra vires to defeat a recovery upon an executed contract, the rule is now well settled, at least in this court, that where the action is brought upon the illegal contract it is a good defense that the corporation was prohibited by statute from entering into such contract, although in an action upon a quantum meruit it may be compelled to respond for the benefit actually received."

In Twiss v. Guaranty Life Ass'n, 87 Iowa, 733, 55 N. W. 8, page 9, 43 Am. St. Rep. 418, the court said: "* * * where an ultra vires contract has been partly performed, the party repudiating it may be compelled to account for whatever benefits may have been received by reason of it." And further (page 10 of 55 N. W.): "As we have said, where an ultra vires contract is made and performed on one side, the other party cannot be permitted to enjoy the benefits received, but will be required in a proper action to account; in other words, the doctrine of a want of power to contract cannot be invoked to aid a party to perpetrate wrong and injustice."

In Beach v. Wakefield, 107 Iowa, 567, 76 N. W. 688, 694, 78 N. W. 197, the court quoted from Manchester & L. R. R. v. Concord R. R., 66 N. H. 100, 20 A. 383, page 694, 9 L. R. A. 689, 49 Am. St. Rep. 582, as follows: "If an agreement is legally void and unenforceable by reason of some statutory or common-law prohibition, either party to the agreement, who has received anything from the other party, and has failed to perform the agreement on his part, must account to the latter for what he has received. Under these circumstances the courts will grant relief irrespective of the invalid agreement, unless it involves some positive immorality, or there are other reasons of public policy why the courts should refuse to grant relief in the case."

In Simmons v. Farmers' Union Co-op. Ass'n, 114 Neb. 463, 208 N. W. 144, 145, plaintiff, as assignee of certain of the directors of the defendant corporation who had executed and paid certain accommodation promissory notes for said corporation, brought suit to recover the amount paid. The stockholders intervened and denied liability on the ground that the indebtedness was incurred in excess of the statutory and charter limit. The court said:

"As a general rule, the defense of ultra vires is available to a corporation when sued upon an executory contract which it had no authority to make. In many of the jurisdictions the rule obtains that, where a contract, ultra vires of a corporation, has been fully executed on one side, and the corporation has received and retained the benefits of the illegal contract, it will be estopped from urging the defense of ultra vires. The more logical view, however, is that a corporation that has received the benefits of a strictly ultra vires contract is not estopped to set up that defense when sued upon such contract, but the rule is generally recognized that a recovery may be had at least upon quantum meruit for the benefits received by a corporation under an

ultra vires contract. A corporation may not, in violation of its charter, enter into a contract, whereby it receives and retains the benefits of its illegal contract, and then shield itself from liability for benefits received by pleading ultra vires as a defense. Healy-Owen-Hartzell Co. v. Montevideo Farmers' & Merchants' Elevator Co., 165 Minn. 330, 206 N. W. 646 [44 A. L. R. 1238].

"In many of the decisions of the courts of this country the view is taken that a recovery directly upon an ultra vires contract should be denied, but the courts adopting this view have generally striven to do justice between the parties, so far as could be done, consistent with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation made therefor. In such cases, the action is not maintained upon the unlawful contract nor according to its terms, but upon an implied contract of the corporation to return, or, failing so to do, to make compensation for, property or money which it has no right to retain. To maintain such an action is not to affirm, but to disaffirm, the unlawful contract. A recovery on quantum meruit for benefits received under the contract is allowed. .7 R. C. L. p. 678, §§ 679–681."

Plaintiffs ask that the corporation have a lien on the stock of the several defendants and that the stock be sold to satisfy the lien. But the transactions out of which the corporation acquired a purported lien on the stock were all of them ultra vires, and the purported lien in each instance must fall with the rest of the transaction.

The amounts found due from the several defendants to the corporation are not, under the circumstances, binding upon this court. The case is here tried de novo.

The decree of the trial court in the case at bar will be reversed; but inasmuch as there must be accountings, minor adjustments of interest, and other incidental matters, the case will be remanded to the trial court, with instructions to reinstate the First National Bank of Omaha as a defendant, and to take such further proceedings as may be necessary (including the taking of evidence) to carry out the views herein expressed, including the entry of judgment. Allowances to plaintiffs' attorneys for expenses incurred, including the employment of counsel to prosecute the action, will be made by the trial court; the same to be paid by the defendant Disbrow & Company.

It is so ordered.